UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DORA MAY TURNER, | ) | Civil Action No.: 4:20-cv-02861-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| -vs- | ) | |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for supplemental security income (SSI). The only issues

before the Court are whether the findings of fact are supported by substantial evidence and whether

proper legal standards have been applied. This action is proceeding before the undersigned pursuant

to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for SSI on September 18, 2017, alleging inability to work since

December 30, 2011. (Tr. 21). Her claims were denied initially and upon reconsideration. Thereafter,

Plaintiff filed a request for a hearing.   A hearing was held on July 15, 2019, at which an

Administrative Law Judge (ALJ) heard testimony from Plaintiff and an impartial vocational expert

(VE). (Tr. 37).   At the hearing, Plaintiff amended her alleged onset date to the date of her

---

[1]Recently, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant
to Fed. R. Civ. P. 25(d), she is automatically substituted for Defendant Andrew Saul, who was
the Commissioner of Social Security when this action was filed.

application, September 18, 2017. (Tr. 21, 174). The ALJ issued an unfavorable decision on August 12, 2019, finding that Plaintiff was not disabled within the meaning of the Act.  (Tr. 21–32). Plaintiff filed a request for review of the ALJ's decision, which the Appeals Council denied on June 3, 2020, making the ALJ's decision the Commissioner's final decision.  (Tr. 1-3).  Plaintiff filed this action on August 6, 2020. (ECF No. 1).

**B.    Plaintiff's Background and Medical History**

**1.    Introductory Facts**

Plaintiff was born on October 29, 1965, and was fifty-one years old on the date the application was filed. (Tr. 31). Plaintiff had a limited education and past work as an order clerk and order puller. (Tr. 30–31). Plaintiff alleged disability originally due to depression, carpal tunnel, whiplash, nerve damage, degenerative arthritis, psoriatic arthritis, migraines, asthma, bronchitis, and vitamin D deficiency. (Tr. 177).

**2.    Medical Records and Opinions**

**<u>Before the Alleged Onset Date</u>**

Prior to Plaintiff's alleged onset date, she began pain management treatment with Dr. Rogers due to back and neck pain radiating to her arms and legs. Plaintiff's ongoing diagnoses included neck pain, cervical spondylosis, cervical radiculopathy, low back pain, migraine, depressive disorder, mononeuritis of upper limb and mononeuritis multiplex, and backache. (Tr. 287, 310–11, 314–15, 319–20). She regularly reported trouble sleeping due to back pain. (Tr. 280, 310, 313). Plaintiff indicated ice, medication, rest, and walking helped and lifting, sitting, standing, and bending over made the pain worse. (Tr. 310, 314 ). The severity of Plaintiff's pain ranged from a 4 to 10/10. (Tr. 262, 274, 278, 280, 284, 288, 290, 293, 310, 314). She denied side effects from her medications and

reported they provided 50–90% relief. (Tr. 262, 265, 274, 283, 287, 289 (except report of abdominal pain from diclofenac, which was then discontinued), 290, 295, 310, 314). Her physical exams throughout this period were mostly normal, except for occasional cervical, lumbar, and occipital pain or tenderness and one note of tearful, anxious, and depressed affect. (Tr. 263, 275, 281, 285, 295, 311, 315, 306). Plaintiff indicated she was able to perform normal ADLs, including walking, sweeping, mopping, and yard work. (Tr. 310, 314). Dr. Rogers referred Plaintiff to physical therapy and psychological counseling, but it does not appear she went to either. (Tr. 265, 287, 292, 306).

A December 2016 x-ray of Plaintiff's cervical spine showed degenerative changes—including retrolisthesis of C4 in relation to C5, which had been noted on a February 2011 study, narrowing of the C4–C5 interspace, and osteophyte formation at several levels—but no evidence of a definite fracture. (Tr. 253). Plaintiff was diagnosed with C5–C6 degenerative disc disease/degenerative joint disease and unspecified chest pain. (Tr. 252).

A January 2017 nerve conduction and EMG study of Plaintiff's lower extremities was normal with no electrophysiologic changes. (Tr. 296–303).

An August 2017 nerve conduction and EMG study of Plaintiff's upper extremities showed electrophysiologic changes in the motor and sensory studies demonstrating bilateral median motor axonal loss. (Tr. 272). Dr. Rogers noted these findings were consistent with mild to moderate bilateral median nerve compromise at the wrist (carpal tunnel), affecting the right wrist more than the left. (Tr. 272). The EMG examination showed no abnormal electrophysiologic changes or clear evidence of cervical radiculopathy. (Tr. 272). Dr. Rogers wrote Plaintiff a prescription for wrist splints. (Tr. 265).

**After the Alleged Onset Date**

3

**2017**

On October 2, 2017, Plaintiff followed up with Dr. Rogers regarding her neck and lower back pain. (Tr. 260). Plaintiff complained of neck pain radiating into her shoulders and arms and low back pain radiating into her legs. (Tr. 260). The pain interfered with her sleep and ADLs. (Tr. 260). She described the pain as sharp, dull, tingling, aching, numb, burning, stabbing, and throbbing and rated an 8/10. (Tr. 260). Records from this visit indicate Plaintiff's medical history included COPD, migraines, and carpal tunnel release. (Tr. 260). Plaintiff's medications included Cymbalta, Clonazepam, Opana ER, Oxycodone, Nabumetone, Diclofenac Sodium, and Vitamin D. (Tr. 260). On examination, Plaintiff was in no acute distress, with normal gait and congruent, non-depressed mood and affect. (Tr. 260). Dr. Rogers assessed cervical spondylosis, neck pain, cervical radiculopathy, low back pain, migraine, depressive disorder, vitamin D deficiency, and joint pain. (Tr. 260). Dr. Rogers noted Plaintiff had a cervical MRI and counseling session scheduled for that week;  however, there are no records of either. (Tr. 261),

On November 30, 2017, Plaintiff presented to Dr. Rogers for pain management. (Tr. 330). She reported frequent or severe headaches, radiating pain in her arms and legs, muscle pain and weakness, joint pain, and neck and back pain. (Tr. 330). Plaintiff described the pain as sharp, tingling, aching, burning, throbbing, shooting, and numb and rated a 6 or 7/10. (Tr. 330). Plaintiff brought her medications for verification and did not report any side effects. (Tr. 330, 331). She had overtaken medication that month and admitted to taking her mother's medication. (Tr. 331). Plaintiff reported sleeping well. (Tr. 331).

4

## 2018

On January 4, 2018, Plaintiff presented to Dr. Rogers for pain management. (Tr. 332). Plaintiff described her pain as a 7/10, sharp, tingling/pins and needles, aching, numbness, burning, and throbbing. (Tr. 332). She reported her pain was worsened by physical activity and stress and decreased by rest, ice, and heat. (Tr. 332). She indicated the pain fluctuated, radiated to both legs, and interfered with sleep and work. (Tr. 332). Dr. Rogers noted Plaintiff's imaging included an x-ray, MRI, and NCV/EMG. (Tr. 332). Plaintiff reported previously receiving pain injections and experiencing 90% relief. (Tr. 332). She stated her medication regimen allowed her to perform ADLs. (Tr. 332). Plaintiff's pain management goals were to be able to walk for prolonged periods, work full or part time, participate in recreational and social activities, and get restful sleep. (Tr. 332). Plaintiff indicated her goals were being met and denied any concerns about her medications. (Tr. 332). Dr. Rogers noted a normal physical examination, including normal gait and a congruent, non-depressed mood and affect. (Tr. 332). Plaintiff reported the medications were helpful and denied any side effects. (Tr. 333). Dr. Rogers noted Plaintiff was weaning off Klonopin. (Tr. 333).

On February 7, 2018, Plaintiff presented to Dr. Rogers for pain management follow-up. (Tr. 334). Plaintiff reported increased headaches and low back pain. (Tr. 334, 335). She rated her overall pain a 7/10 and described it as sharp, dull, tingling, aching, numbness, burning, throbbing, and shooting. (Tr. 334). She described being unable to function because of her headaches. (Tr. 335). Plaintiff also reported trouble staying asleep. (Tr. 335). She denied medication side effects. (Tr. 334, 335). Dr. Rogers refilled her medications and wrote an order for a lumbar belt. (Tr. 335).

On March 14, 2018, Plaintiff followed up with Dr. Rogers for pain management. (Tr. 336). Plaintiff complained of headache, neck pain, mid-back pain, and low-back pain radiating to her arms

and legs. (Tr. 336). She rated her pain a 6 or 7/10 and described it as sharp, dull, tingling, aching, numb, burning, and shooting. (Tr. 336). Dr. Rogers noted prior effective treatments included rest, heat, injections, and narcotic medication. (Tr. 336). He also noted physical therapy had not been effective. (Tr. 336). Plaintiff's symptoms now included restless leg symptoms and shoulder, hip, and knee pain. (Tr. 336). Plaintiff reported increased pain. (Tr. 337). Dr. Rogers noted Plaintiff was out of medication because she missed her last appointment. (Tr. 337). Plaintiff reported trouble falling and staying asleep. (Tr. 337). She denied medication side effects. (Tr. 337).

On April 12, 2018, Plaintiff returned to Dr. Rogers for pain management. (Tr. 338). She complained of daily migraines, low-back pain, joint pain, and carpal tunnel syndrome. (Tr. 338, 339). She rated her pain a 6/10 and indicated it interfered with sleep and ADLs. (Tr. 338). Plaintiff reported treating her migraines with BC powders and continuing to drink energy drinks. (Tr. 339). She reported trouble falling and staying asleep. (Tr. 339). Plaintiff denied medication side effects. (Tr. 338). However, Plaintiff failed to bring her medication for verification. (Tr. 338).

Because of her multiple treatment violations, Plaintiff was discharged from Dr. Rogers's care. (Tr. 339).

On April 22, 2018, Plaintiff presented to the emergency department. (Tr. 349). Plaintiff reported feeling like she was losing her mind. (Tr. 349). She felt anxious, agitated, dizzy, and unable to concentrate. (Tr. 349). She indicated she was weaning off of pain medication and antidepressants. (Tr. 349). On examination, Plaintiff was noted to be alert and cooperative, but anxious and tearful. (Tr. 351–52). She was diagnosed with drug withdrawal, anxiety, depression, and medication reaction. (Tr. 352). The treating physician discussed how to appropriately wean off of SSRIs, switched her depression medication to fluoxetine due to its decreased serotonin withdrawal

6

symptoms, and arranged for outpatient primary care follow-up. (Tr. 353).

On April 27, 2018, Plaintiff followed up with Dr. Phillips, D.O., regarding her hospital visit. (Tr. 360). Dr. Phillips noted Plaintiff cried and repeated herself throughout the interview. (Tr. 360). Plaintiff thought Cymbalta made her crazy. (Tr. 360). She denied hallucinations and homicidal and suicidal ideations. (Tr. 360). Plaintiff described feeling ridiculed, but was unable to further explain that feeling. (Tr. 360). She initially refused to complete a mental health screening tool because she did not want to reveal personal information and was afraid she would be taken out in a straight jacket. (Tr. 360). On examination, Dr. Phillips noted Plaintiff was alert, oriented, and in no acute distress, but she appeared anxious and teary, was rambling and repeating, and had mildly pressured speech and a frustrated affect. (Tr. 360). Plaintiff's physical examination was otherwise normal. (Tr. 360). Dr. Phillips increased Plaintiff's antidepressant dosage, added olanzapine, and continued hydroxyzine as needed for anxiety. (Tr. 361). He noted they would address her chronic pain at the next visit. (Tr. 361).

On May 14, 2018, Plaintiff followed up with Dr. Phillips. (Tr. 362). Plaintiff reported feeling crazy on the inside and out due to her neck pain. (Tr. 362). She indicated her son's graduation was in two weeks and she could not sleep and felt crazy. (Tr. 362). She had not been taking the olanzapine due to a misunderstanding and stated the fluoxetine may have helped a little. (Tr. 362). Dr. Phillips noted a normal physical examination other than some mild spasm in Plaintiff's trapezius muscles. (Tr. 362). He assessed bipolar affective disorder. (Tr. 362). Dr. Phillips noted Plaintiff's heart rate was not elevated despite a seemingly significant level of pain. Dr. Phillips opined Plaintiff was unconsciously amplifying her symptoms due to her mental health status. (Tr. 362). He explained the need to focus on Plaintiff's mental health before tackling her subjective physical concerns. (Tr.

7

362).

### 2019

On April 19, 2019, Plaintiff presented to the emergency department complaining of back and neck pain after a car accident. (Tr. 346). She reported being rear-ended and hitting her head on the steering wheel. (Tr. 346). Plaintiff reported a history of scoliosis and was concerned the injury might have made her back worse. (Tr. 346). On examination, Plaintiff exhibited normal range of motion in her neck and no evidence of trauma to her cervical spine. (Tr. 347). She was assessed with acute cervical strain after a minor motor vehicle accident. (Tr. 347).

### State Agency Physician and Consultative Examiner Opinions

On December 12, 2017, Dr. Kofoed, Ph.D., conducted a consultative psychological evaluation. (Tr. 322). Plaintiff reported chronic back and neck pain. (Tr. 322). She reported a neck injury after a 2008 car accident, scoliosis, asthma, and COPD. (Tr. 322). Dr. Kofoed noted Plaintiff's medical records also mentioned migraine headaches, occipital neuralgia, carpal tunnel syndrome, and joint pain. (Tr. 322). Plaintiff stated she continued to do most of the household chores herself, but she had difficulty bending, twisting, lifting, and sitting for long periods of time. (Tr. 322). She reported driving occasionally, despite having an expired license. (Tr. 322). Plaintiff indicated she did some grocery shopping independently but preferred to have someone with her. (Tr. 323). She reported managing her own finances. (Tr. 323).

Plaintiff denied using illicit drugs or drinking alcohol excessively, but admitted to smoking about half a pack of cigarettes every day. (Tr. 322). She indicated she lived with her two sons, who were 21 and 18-years old at the time. (Tr. 322). Plaintiff stated her older son had cerebral palsy, but was able to work, and her younger son was doing well in high school. (Tr. 322). She reported

quitting school in the eleventh grade and not pursuing a GED. (Tr. 323). Plaintiff stated she made friends easily and indicated that was one of her strengths. (Tr. 323).

Plaintiff indicated she had never received mental health care of any kind. (Tr. 322, 323). She reported experiencing childhood abuse, intrusive memories related to that abuse, heightened arousal and startle, significant anxiety in public places and crowds, and trouble sleeping. (Tr. 322, 323). Dr. Kofoed noted Plaintiff was punctual, and appropriately dressed and groomed. (Tr. 323). He found Plaintiff's mood anxious and somewhat tearful and noted she cried frequently throughout the interview. (Tr. 323). Plaintiff stated she tended to feel depressed, worried, and overwhelmed. (Tr. 323). She often slept only three or four hours because she had difficulty staying asleep and her mind would race. (Tr. 323). Plaintiff reported a recent 40-pound weight gain. (Tr. 323). She denied suicidal or homicidal intentions. (Tr. 323).

Dr. Kofoed noted Plaintiff's effort was appropriate on cognitive tasks and she was eager to do well and oriented in all spheres. (Tr. 324). Plaintiff performed serial seven subtractions, but was very slow, had three incorrect attempts, and seemed flustered. (Tr. 324). She was able to state the months of the year in reverse order, but omitted one month. (Tr. 324). She learned a four-word list and later could recall two words independently and two with prompting. (Tr. 324). She copied geometric shapes and angles with adequate attention to detail and later could recall three of the shapes independently and one with prompting. (Tr. 324).

Dr. Kofoed found no indications of psychotic processes. (Tr. 323). He noted Plaintiff was likely to be easily overwhelmed in a minimally stressful situation and may be easily overwhelmed in a hectic public environment. (Tr. 323, 324). He also noted Plaintiff did not have much confidence in her own abilities to solve problems. (Tr. 324). Accordingly, Dr. Kofoed found Plaintiff would likely

do much better in a slow-paced setting, working with just one or two people whom she knew well and could develop trust with. (Tr. 324). Regarding concentration, persistence, and pace, Dr. Kofoed found Plaintiff functioned in a low average range of intellectual ability and had poor overall stress management skills. (Tr. 324). He noted Plaintiff's frustration on the serial sevens task may indicate some concentration difficulties. (Tr. 324). Dr. Kofoed diagnosed depression and generalized anxiety, or possibly post-traumatic stress disorder. (Tr. 324). He opined Plaintiff was capable of doing simple, repetitive tasks, but noted her pain issues would need to be taken into consideration. (Tr. 324).

Regarding Plaintiff's physical impairments, on both the initial and reconsideration levels, the agency physicians found insufficient evidence to rate Plaintiff's condition because Plaintiff twice failed to attend her scheduled consultative orthopedic examination. (Tr. 77–78, 90).

Regarding Plaintiff's mental impairments, Dr. Horn, Ph.D., a non-examining state agency consultant, found Plaintiff's anxiety and depressive disorders were medically severe. (Tr. 78). Based on his review of Plaintiff's medical records, he opined Plaintiff had moderate limitations in her abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself and a mild limitation in her ability to understand, remember, or apply information. (Tr. 79). He concluded Plaintiff was able to perform detailed tasks away from the public. (Tr. 79). Dr. Horn based his assessment on Plaintiff's educational level; low average IQ; ability to drive, shop, and manage funds; anxiety in public and crowds but ability to socialize with a close friend; other reported ADLs; and problems coping with stress. (Tr. 79, 82, 83). On reconsideration, Dr. Harkness, Ph.D., agreed with Dr. Horn, noting Plaintiff had not alleged any worsening or new conditions or additional treatment. (Tr. 91–96).

10

C.    **The Administrative Proceedings**

1.    **The Administrative Hearing**

On July 15, 2019, a hearing was held before ALJ Jordan. (Tr. 38).  Plaintiff was represented by Michael Ogden and Paula Day testified as a VE. (Tr. 38).

a.    **Plaintiff's Testimony**

Plaintiff testified she was single and currently living with her sister, her sister's husband, and her oldest son. (Tr. 42–43). She completed eleven years of school, did not graduate high school, and did not get her GED. (Tr. 44). Plaintiff last worked in 2005. (Tr. 45). Prior to 2005, she worked off-and-on as an office helper, taking orders over the phone and filing. (Tr. 46–47). She testified she stopped working because her son had cerebral palsy and had surgeries and in-home therapy until he was 17. (Tr. 45). Plaintiff testified she had tried to find work and applied for a job in a nursing home, but a more qualified candidate got the job. (Tr. 45).

Plaintiff stated she helps as much as she can around the house with housekeeping, cooking, laundry, dishes, vacuuming, mopping, and sweeping. (Tr. 47). She testified she spends maybe four hours per day watching TV. (Tr. 47). She reads, does crossword puzzles, and helps with yard work. (Tr. 47–49). Plaintiff tries to walk regularly and stated she could walk about half a mile. (Tr. 48). She takes care of her own personal hygiene, smokes about half a pack of cigarettes a day, and does not drink alcohol or use illicit drugs. (Tr. 48–50).

Plaintiff testified her neck and back pain were her most severe physical problems. (Tr. 50). She described experiencing severe whiplash and other back injuries after a car accident. (Tr. 50). She said x-rays and MRIs showed bone spurs and bulging discs impinging the nerves in her neck and back. (Tr. 50). Plaintiff testified she was unable to receive steroid injections in her back because of

11

the bone spurs. (Tr. 51). She stated her only pain treatment was thirty minutes of yoga every morning and that it helped a little bit. (Tr. 51). Plaintiff testified she also has carpal tunnel syndrome; daily headaches stemming from her neck injury; numbness and tingling in her arms, hands, and shoulders; bursitis in her knees; asthma; and bronchitis. (Tr. 51–53). Her only medication is an Albuterol inhaler for asthma flares, which she stated happened when the weather changed. (Tr. 53). Plaintiff testified she took medications for years but stopped because they were no longer helping her pain and were causing bad side effects. (Tr. 53–54).

Plaintiff testified she could sit for 30 minutes, stand for 15 or 20 minutes, walk for about half a mile, lift 10 pounds with difficulty, bend over to pick up things, and climb stairs with pain in her knees and back. (Tr. 54–55).

Plaintiff testified she had wrist surgery for her carpal tunnel about three years prior to the hearing but the carpal tunnel came back, as shown by a nerve conduction study. (Tr. 55–56). She indicated her hands tingled and went numb every day, especially when she sat still for a long time. (Tr. 56). She described difficulty grasping and holding on to things. (Tr. 56). Plaintiff stated her neck hurt and her arms got tingly and numb when she brushed or dried her hair. (Tr. 56). Plaintiff reported taking BC powders for her pain and receiving 30% relief for about 30 minutes. (Tr. 57). She helps with chores in five or ten minute intervals and needs to rest in between. (Tr. 57–58).  She is active for maybe three hours of the day, including the rest time. (Tr. 58). She indicated she is not able to do six or seven hours of work in one day. (Tr. 58). Plaintiff stated her headaches are worse than a migraine, can last all day or for a few hours, and make her want to lay down and close her eyes. (Tr. 58–59). Plaintiff testified she was not currently receiving treatment for her mental health symptoms, which include feeling like she cannot breathe and feeling hysterical. (Tr. 59–60). She indicated she

12

experiences anxiety symptoms three or four times a week and has to go into a room and calm herself down, which can take 15 to 30 minutes. (Tr. 60–61).

At the end of Plaintiff's testimony, the ALJ noted there was not much evidence regarding Plaintiff's physical impairments because she did not go to her physical consultative examinations, even though they were scheduled more than once. (Tr. 60–61).

### b.     Vocational Evidence

The VE testified to PRW of order clerk and order puller. (Tr. 61–62). The Dictionary of Occupations Titles (DOT) classifies order clerk as semiskilled and sedentary and order puller as unskilled and medium. (Tr. 62). The ALJ did not have the benefit of a consultative examination or functional assessment, so she presented a hypothetical individual capable of light work mainly based on Plaintiff's testimony. (Tr. 62). The VE testified Plaintiff's PRW would be excluded if the hypothetical person of Plaintiff's age, education, and PRW could perform light work, lift 10 pounds frequently and 20 pounds occasionally; sit, stand, and walk up to six hours of an eight-hour day for a total of eight hours with normal and usual breaks; occasionally climb ladders; frequently climb steps, stoop, crouch, and crawl; understand, remember, and carry out simple instructions; maintain concentration, persistence, and pace for at least two-hour periods for a total of eight hours with usual and normal breaks every two hours; occasionally interact with the general public; frequently interact with two or three familiar coworkers; and had to avoid concentrated exposure to heat, humidity, hazards, and respiratory irritants of all kinds and high volume, fast-paced production jobs. (Tr. 62–64). However, the VE indicated the hypothetical individual could perform work as a marker, office helper, or router. (Tr. 64).

Plaintiff's attorney presented the VE with a hypothetical individual with the same postural

limitations but who was limited to sedentary work. (Tr. 65). The VE indicated this individual would also be precluded from performing Plaintiff's PRW. (Tr. 65). In addition, this hypothetical individual would be unable to maintain competitive work if she had to be off-task 15% of the time or absent two days per month. (Tr. 66).

**2.     The ALJ's Decision**

In the decision of August 7, 2019, the ALJ made the following findings of fact and conclusions of law (Tr. 21):

1.     The claimant has not engaged in substantial gainful activity since September 18, 2017, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: cervical degenerative disc disease and degenerative joint disease; scoliosis; asthma; chronic obstructive pulmonary disease (COPD); affective disorder; and anxiety disorder (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), as the claimant is able to lift and carry twenty pounds occasionally and ten pounds frequently and stand, walk, and sit up to six hours each in an eight-hour workday for a total of eight hours with normal and usual breaks. However, the claimant can occasionally climb ladders. The claimant can frequently climb steps, stoop, crouch, and crawl. The claimant must avoid concentrated exposure to heat, humidity, respiratory irritants of all kinds, and hazards. The claimant can understand, remember, and carry out simple instructions and maintain concentration, persistence, and pace for at least two-hour periods for a total of eight hours with usual and normal breaks every two hours. The claimant can have no more than occasional[] interaction with the general public and frequent interaction with two or three familiar coworkers. The claimant must avoid high volume, fast pace production jobs.

5.     The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on October 29, 1965 and was 51 years old, which is defined as a younger individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 18, 2017, the date the application was filed (20 CFR 416.920(g)).

## II.  DISCUSSION

Plaintiff argues the ALJ failed to  (1) explain why she excluded certain limitations from the mental RFC, (2) attain sufficient guidance in formulating the physical RFC, and (3) properly assess Plaintiff's subjective complaints.

The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A). To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting the "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court

must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence as a threshold is "not high;" "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

**B.    ANALYSIS**

**RFC**

Plaintiff alleges the ALJ failed to properly consider Dr. Kofoed's opinion, resulting in a mental RFC that fails to account for the extent of Plaintiff's impairments. Plaintiff further asserts the ALJ failed to adequately develop the record regarding her physical impairments.

An adjudicator is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c). In making that assessment, he must consider the functional limitations resulting from the claimant's medically determinable impairments. Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, at *2. This ruling provides that: "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8, *7. "The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were

considered and resolved." *Id.* Additionally, "'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (*quoting Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig*, 76 F.3d at 595.

Mental RFC

Plaintiff asserts the ALJ failed to include some of Dr. Kofoed's findings, resulting in a mental RFC that fails to account for the full extent of Plaintiff's impairments. (ECF No. 21 at 9). The ALJ found Plaintiff's affective and anxiety disorders were severe impairments but did not reach listing level severity. (Tr. 24–25). In crafting the RFC, the ALJ considered Plaintiff's testimony that she feels hysterical and cannot breathe twice a week, was prescribed medications for her mental conditions but no longer takes them, and has trouble completing tasks. (Tr. 27). She further considered medical records indicating Plaintiff's diagnoses and Plaintiff's emergency department visit when she was weaning off her medications, along with records indicating normal mental status examinations and Plaintiff's apparent lack of treatment from May 2018 to April 2019. (Tr. 28).

The ALJ then fully summarized Dr. Kofoed's report, which was summarized by the undersigned above. (Tr. 28–29). Regarding Dr. Kofoed's opinions, the ALJ stated:

> In December 2017, consultative examiner, Dr. Kofoed, opined the claimant is likely to become easily overwhelmed in a minimally stressful situation and might be overwhelmed in a hectic public environment. The doctor concluded that the claimant would likely do much better in a slow-paced setting, working with just one or two people whom she knows well and for whom she can develop trust. He believed the claimant might have some concentration difficulties, her overall stress management skills were poor, and her pain issues would need to be tak[en] into consideration, but

the claimant is capable of doing simple, repetitive tasks from a cognitive perspective. He found the claimant appeared capable of making financial decision[s] in her own best interest. The opinion of the consultative examiner is supported by a detailed report of examination of the claimant and the opinion is mostly consistent with the reliable evidence of record including treatment notes.

(Tr. 29 (citations omitted)).

The ALJ also considered the state agency psychological consultants' opinions that Plaintiff had the ability to perform up to detailed tasks away from the public, but, based in part on Dr. Kofoed's opinion, found Plaintiff more limited. (Tr. 30).

Based on this evidence, the ALJ found:

The claimant can understand, remember, and carry out simple instructions and maintain concentration, persistence, and pace for at least two-hour periods for a total of eight hours with usual and normal breaks every two hours. The claimant can have no more than occasional[] interaction with the general public and frequent interaction with two or three familiar coworkers. The claimant must avoid high volume, fast pace production jobs.

(Tr. 26).

Plaintiff asserts "the ALJ failed to include Dr. Kofoed's remark that Plaintiff was likely to be easily overwhelmed in a minimally-stressful situation, may be easily overwhelmed in a hectic public environment, and that her overall stress management skills were poor." (ECF No. 21 at 21). However, the ALJ expressly considered these findings in her explanation of Plaintiff's RFC. (Tr. 29). To the extent Plaintiff is disagreeing with the ALJ's assessment of Dr. Kofoed's opinion, her mere disagreement does not show a lack of support and this court may not re-weigh the evidence already considered by the ALJ. *See Johnson*, 434 F.3d at 653.

Further, while Plaintiff insists the ALJ failed to include mental limitations based on Dr. Kofoed's opinion, Plaintiff fails to articulate what additional limitations are warranted. (*See* ECF No. 21 at 12–14). The ALJ accommodated Plaintiff's propensity to get overwhelmed in a hectic public

environment by limiting her to only occasional interaction with the general public. In addition, the record suggests the ALJ accounted for Plaintiff's general tendency to get overwhelmed easily by eliminating high-volume, fast-paced production jobs. (*See* Tr. 63 ("Let's avoid because of the report from the psyche CE, psychological CE. Let's avoid [] high volume, fast-paced production jobs because apparently, she becomes overwhelmed fairly, easily.")). The ALJ did appropriately consider this portion of Dr. Kofoed's opinion and Plaintiff fails to show how the ALJ's finding constitutes error. (Tr. 29)

Contrary to Plaintiff's assertions, it appears the ALJ considered the entirety of Dr. Kofoed's opinion, found it supported and mostly consistent, and relied on it heavily in formulating Plaintiff's mental RFC. Having fully considered the longitudinal evidence of Plaintiff's severe mental impairments, including Dr. Kofoed's consultative report, the ALJ crafted a logical mental RFC that is supported by substantial evidence.

Physical RFC

Plaintiff also argues the ALJ failed to adequately develop the record, resulting in a physical RFC that is not supported by substantial evidence. (ECF No. 21 at 15–16).

Recognizing the need for more information regarding Plaintiff's physical condition, the Agency scheduled a consultative examination with Dr. Korn for December 11, 2017. (Tr. 201). On December 7, 2017, an Agency representative called Plaintiff to remind her about the examination and Plaintiff indicated she planned to attend. (Tr. 201). On the day of the examination, Plaintiff asked to reschedule because she was sick and her car was not working. (Tr. 201). The Agency agreed and rescheduled the physical consultative examination for January 8, 2018. (Tr. 201). An Agency representative reminded Plaintiff on January 2, 2018, and Plaintiff indicated she would go. (Tr. 201). However, Plaintiff was a no show for her appointment. (Tr. 201). Because Plaintiff failed to attend

her consultative examination, the state agency physicians stated they had insufficient evidence to assess Plaintiff's functional limitations. (Tr. 77–78, 90).

At the hearing, the ALJ noted Plaintiff did not show up for the examinations, leaving her with very limited evidence on which to base her vocational hypothetical. (Tr. 60–61 ("She didn't go to her CEs, so other than what we have regarding just the scoliosis, and what I know the severity of that, that's all we have really on the physicals, so they're going to be pretty limited unfortunately.")). The VE indicated Plaintiff's PRW was sedentary (order clerk) and medium (order puller). (Tr. 61–62). Without guidance from the agency physicians, the ALJ found Plaintiff capable of light work "due to her testimony mainly." (Tr. 62). At the end of the hearing, Plaintiff's attorney questioned the VE regarding a hypothetical individual with the same limitations but capable of only sedentary work. (Tr. 66). He argued Plaintiff was limited to sedentary work based on the positive nerve conduction study showing carpal tunnel in both of Plaintiff's wrists and scan showing degenerative disc disease at C5–6, and complaints of leg weakness and numbness, low back, and neck pain. (Tr. 66).

It is the claimant's duty to introduce evidence of impairments through the first four steps of the sequential process. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); 20 C.F.R. § 416.912(a) ("you have to prove to us that you are blind or disabled"); 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). However, an ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). "The key consideration is 'whether the record contained sufficient medical evidence for the ALJ to make an informed decision' regarding the claimant's impairment." *Lehman v. Astrue*, 931 F. Supp. 2d 682,

692–93 (D.Md. 2013) (quoting *Craft v. Apfel*, No. 97-2551, 1998 WL 702296 (4th Cir. 1998)).

"Where the ALJ fails in his duty to fully inquire into the issues necessary for adequate development

of the record, and such failure is prejudicial to the claimant, the case should be remanded." *Marsh v.*

*Harris*, 632 F.2d 296, 300 (4th Cir. 1980) (citations omitted). To show prejudice, a claimant must

show the Commissioner's decision "might reasonably have been different had that evidence been

before him when his decision was rendered." *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).

Notably, an "ALJ is under no obligation to supplement an adequate record to correct

deficiencies in a plaintiff's case." *Lehman*, 931 F. Supp. 2d at 693. Further, "[a] lack of opinion

evidence from a treating physician does not . . . necessarily trigger a duty to develop the record," *id.*

at 694, particularly when the claimant is represented by counsel, *see Hawkins v. Chater*, 113 F.3d

1162, 1167 (10th Cir. 1997) ("[W]hen the claimant is represented by counsel at the administrative

hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and

present claimant's case in a way that the claimant's claims are adequately explored.").

While the state agency medical consultants found insufficient evidence to rate Plaintiff's

physical condition, the ALJ disagreed and found that "based on the record there is sufficient evidence

to make a disability determination and the evidence of record, including diagnostic images and the

claimant's testimony, is consistent with claimant's residual functional capacity being place[d] in the

light category of work." (Tr. 29). In support, the ALJ cited Plaintiff's hearing testimony and

December 12, 2016 cervical spine x-ray showing degenerative disc disease. (Tr. 29 (citing Tr. 251,

253)). Having found sufficient evidence to make an informed decision regarding Plaintiff's condition,

the ALJ was under no obligation to obtain additional information.

This is not a case where the Commissioner failed to help a pro se claimant obtain medical

records or failed to order a necessary consultative examination. Rather, Plaintiff, who was represented

by counsel throughout the administrative process, failed to attend her consultative examination, resulting in limited evidence regarding her "functional capacity to do work-related physical . . . activities." 20 C.F.R. § 416.912(a)(2)(iii) (explaining the claimant is responsible for providing complete and detailed enough evidence for the Commissioner to determine her RFC).

Further, even assuming the record before the ALJ was not sufficient, Plaintiff fails to show she suffered any prejudice. At the beginning of the hearing, Plaintiff's attorney indicated the medical records provided to the ALJ were complete. (Tr. 41). Plaintiff did not submit additional medical evidence to the Appeals Council or otherwise show how the Commissioner's decision would have differed if additional evidence had been present in the record.

For her part, the ALJ expressly considered all of the evidence before her, including the evidence Plaintiff's attorney relied on in arguing she was limited to sedentary work and medical records from before the alleged onset date. (Tr. 23–30). The ALJ applied the correct legal standards and the RFC is amply supported by substantial evidence.

**Subjective Symptom Evaluation**

Plaintiff argues the ALJ failed to properly perform the subjective symptom evaluation.

SSR 16-3p is applicable to cases decided after its effective date, such as this case. *See Morton v. Berryhill*, No. 8:16-cv-0232-MBS, 2017 WL 1044847, *3 (D.S.C. Mar. 20, 2017). Although SSR16-3p eliminates usage of the term "credibility" because the regulations do not use the term, the assessment and evaluation of Plaintiff's symptoms requires usage of most of the same factors considered under SSR 96-7p.

Under *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective

complaints of the severity and persistence alleged.  Not until such underlying impairment is deemed established does the fact-finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to evaluate the intensity and persistence of symptoms to determine how symptoms limit capacity for work.  *See also* 20 C.F.R. § 404.1529; SSR16-3p, *4.

The ALJ may choose to reject a claimant's testimony regarding his condition, but the ALJ must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs*., 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)).  A claimant's allegations "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]"  *Craig*, 76 F.3d at 595. The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision.  *See id.*; *see* SSR 16-3p, at *4.

A claimant's statements about intensity, persistence, and limiting effects of symptoms, which are inconsistent with the objective medical evidence and other evidence, are less likely to reduce her capacity to perform work related activities.  SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c).  An individual's symptoms are evaluated based on consideration of objective medical evidence, an individual's statements directly to the Administration, or to medical sources or other sources, and the following factors:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

25

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, at *7; 20 C.F.R. § 404.1529(c). The ALJ at step three is to "consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record." SSR 16-3p, at *11.

Plaintiff asserts the ALJ failed to adequately explain how she evaluated Plaintiff's symptoms, relied on ADLs that do not contradict Plaintiff's allegations or correspond to her ability to perform in a work environment, and failed to expressly consider whether Plaintiff had an impairment capable of causing the alleged symptoms. (ECF No. 21 at 18–21). Contrary to Plaintiff's assertions, and consistent with the governing regulations, the ALJ considered the entire record in evaluating Plaintiff's subjective complaints and explained her findings.

After reciting the applicable law, the ALJ made the following findings concerning Plaintiff's subjective complaints (Tr. 26):

> The claimant alleged disability based on cervical degenerative disc disease and degenerative joint disease, scoliosis, asthma, chronic obstructive pulmonary disease (COPD), depression, and anxiety as well as the non-severe impairments discussed above [carpal tunnel syndrome, headaches, and vitamin D deficiency] (Hearing Testimony & Exhibit B1E). At the hearing, the claimant reported neck and back pain from whiplash and other back injuries (Hearing Testimony). She further said she has bronchitis (Hearing Testimony). The claimant also stated that two to three times a week she feels like she is getting hysterical and cannot breathe (Hearing Testimony). According to the claimant, to treat her conditions she used to be prescribed medications, but she no longer takes pain medications or medications to treat her mental conditions (Hearing Testimony). The claimant testified that she continued to use an inhaler and she did yoga (Hearing Testimony). Due to her conditions and symptoms, the claimant stated that she had a number of limitations, some of which involve lifting, walking, standing, sitting, bending, climbing stairs, using her hands, and completing tasks (Hearing Testimony). The claimant testified that she could only

> spend about five or ten minutes working on chores without a break (Hearing Testimony). Despite such allegations of disabling symptoms and limitations, the claimant can walk for about a half mile for exercise, tend to her personal care needs, cook, do laundry, wash dishes, vacuum, sweep, mop, help with yard work, shop in stores, watch television, read, do crossword puzzles, and drive (Hearing Testimony). Thus, the claimant engages in activities that are not limited to the extent one would expect, given her complaints of disabling symptoms and limitation.
>
> Turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations. More specifically, the medical findings do not support the existence of limitations greater than those reported in the residual functional capacity statement above.

(Tr. 27). The ALJ then discussed the medical evidence related to Plaintiff's cervical degenerative disc disease, degenerative joint disease, and scoliosis (Tr. 27–28); asthma and COPD (Tr. 28); and affective and anxiety disorders (Tr. 28–29).

The ALJ described objective evidence that supported Plaintiff's allegations and that contradicted Plaintiff's allegations, along with Plaintiff's subjective reports of pain to her doctors throughout the relevant period. (Tr. 27–29). For example, the ALJ noted that while Plaintiff alleged radiating pain to her arms and legs, an August 2017 electromyography of Plaintiff's arms showed no clear evidence of cervical radiculopathy and a January 2017 nerve conduction study of Plaintiff's legs was normal. (Tr. 28). In addition, Plaintiff's most recent medical records, from her April 2019 emergency department visit, showed her in no acute distress with normal gait, muscle tone, and range of motion. (Tr. 27). Those records also show a clinically clear cervical spine with no midline tenderness, evidence of trauma, or nexus criteria. (Tr. 28, 347). And Plaintiff was able to elevate her head off the bed without difficulty and rotate, flex, and extend her cervical spine. (Tr. 28, 347). While Plaintiff had a history of asthma and COPD, the ALJ noted her lungs were clear during her physical examinations. (Tr. 28). In discussing Plaintiff's non-severe carpal tunnel syndrome, the ALJ described the August 2017 nerve conduction study that lead to her diagnosis, but noted she was prescribed wrist

splints and did not appear to receive additional treatment during the relevant period. (Tr. 23). Likewise, the ALJ considered Plaintiff's lack of treatment for her severe impairments during the relevant period (COPD) or from May 2018 to April 2019 (back, neck, and joint disorders). (Tr. 28).

> Based on her assessment of the subjective and objective evidence, the ALJ concluded:

> Thus, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 30). The ALJ thus conducted the proper analysis.

Plaintiff also asserts the ALJ improperly relied on her reported ADLs without considering the limited extent to which she could perform those activities. (ECF No. 21 at 18–19). Specifically, Plaintiff argues the ALJ ignored her testimony that she could only perform simple cleaning activities for five to ten minutes at a time, could not sit for more than 30 minutes, could not stand for more than 15 to 20 minutes, paid someone to help with her grocery shopping, and was unable to do six or seven hours of work in a day. (ECF No. 21 at 18–19). However, in her decision, the ALJ recounted Plaintiff's testimony that she "could only spend about five or ten minutes working on chores without a break" and that she had limitations in sitting and standing. (Tr. 27). While Plaintiff testified she paid someone to grocery shop for her, she had previously indicated to Dr. Kofoed that she grocery shopped independently but preferred to have someone with her. (Tr. 323).

Plaintiff further contends her ability to walk about half a mile for exercise, tend to her personal care needs, cook, do laundry, wash dishes, vacuum, sweep, mop, help with yard work, shop in stores, watch television, read, do crossword puzzles, and drive is not inconsistent with her alleged inability to sustain full-time work. (ECF No. 21 at 19).

In support, Plaintiff cites *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020) and *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). In both *Woods* and *Arakas*, the ALJ "failed to account for significant other evidence demonstrating [the claimant's] limited physical capacities" and failed to explain how the claimant's ability to perform minimal daily activities corresponded to performance of full-time work on a sustained basis. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 99–101 (4th Cir. 2020). Plaintiff does not identify any significant evidence the ALJ failed to consider. Rather, here, the ALJ complied with the regulations and considered the entire record, including Plaintiff's ADLs, and found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not entirely consistent with the record evidence.

Accordingly, substantial evidence supports the ALJ's findings on the subjective symptom evaluation and the RFC.

### III.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390.  Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).  As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence.  Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions

under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections

405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.

 s/Thomas E. Rogers, III  
Thomas E. Rogers, III  
United States Magistrate Judge

August 25, 2021  
Florence, South Carolina